UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

MIQUEL CARIAS, JANET RAMIREZ,
MICHAEL PICONE, EVELYN FLECHA, ZENA
MATOS, on behalf of KAILEI MATOS, a minor,
JAIME NINO, and HALONA JAFFE, individually
and on behalf all others similarly situated,

              Plaintiffs,

   - against -

MONSANTO COMPANY, a Delaware
corporation; DOES 1-10, inclusive,

           Defendants.

-------------------------------------------------------------X

Case No.  15 CV 3677

**CLASS ACTION
AMENDED COMPLAINT**

JURY TRIAL DEMANDED

Plaintiffs, MIQUEL CARIAS, JANET RAMIREZ, MICHAEL PICONE, EVELYN FLECHA, ZENA MATOS, on behalf of KAILEI MATOS, a minor, JAIME NINO, and HALONA JAFFE, by and through their counsel, brings this Class Action Amended Complaint against MONSANTO COMPANY, on behalf of themselves and all others similarly situated, and allege, upon personal knowledge as to their own actions and their counsel's investigations, and upon information and belief as to all other matters, as follows:

## NATURE OF THE CASE

1.    This is a consumer protection and false advertising class action. Defendant, MONSANTO COMPANY, markets, advertises and distributes "Roundup" (hereinafter, "the "Product"), the world's most popular weed killer. Defendant makes the claim that the primary ingredient in the Product, glyphosate, works by targeting an enzyme supposedly found only in plants, *but not in people*. And this is blatantly false.

2.    Contrary to Defendant's claim, the primary ingredient in the Product, glyphosate, targets an enzyme found in both plants *and* people. Therefore, where Defendant advertises that the Product targets an enzyme "not found in people," such claim is objectively false and inherently misleading.

3.    Plaintiffs bring claims against Defendant individually and on behalf of a class of all other similarly situated purchasers of the Product for violations of New York's General Business Law §§ 349 and 350. Plaintiffs seek an order requiring Defendant to, among other things: (a) strike the offending slogan from all Roundup labels; (b) conduct a corrective advertising campaign; and (c) pay compensatory damages and restitution to Plaintiffs and Class members.

## JURISDICTION AND VENUE

4.      The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C §
1332(d)(2), inasmuch as the class contains at least one member of diverse citizenship from Defendant
and the amount in controversy exceeds $5 million.

5.      The Court has personal jurisdiction over Defendant because Defendant is authorized
to, and conducts, substantial business in New York, generally, and this District, specifically.
Defendant has marketed, promoted, distributed and sold the Product in New York.

6.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(a)(1), inasmuch as a
substantial part of the events and omissions giving rise to this action occurred in this District as
Defendant distributes the Product for sale within this District.

## PARTIES

7.      Plaintiff, MIQUEL CARIAS, is a resident of Nassau County, New York, and brings
this lawsuit on behalf of himself, as an individual, and on behalf of all other similarly situated persons
in New York.

8.      Mr. Carias has purchased the Product on several occasions over the past four years in
reliance on Defendant's representations that the Product targets an enzyme supposedly found only in
plants.

9.      Specifically, on the label of the Product Plaintiff has repeatedly purchased, the
following words prominently appear: "[g]lyphosate targets an enzyme found in plants but not in
people or pets".

10.     This representation was material to Mr. Carias' decision to make the purchases. Mr. Carias would not have purchased the Product or would have purchased alternative products in the absence of the representation.

11.     Mr. Carias has been diagnosed with a pituitary gland tumor. Exposure to glyphosate has been associated with his disease, and it is more probable than not that his exposure to glyphosate caused his injuries. Mr. Carias first learned that exposure to Roundup can cause serious illnesses sometime after March 2015 when the International Agency for Research on Cancer ("IARC") first published its evaluation of glyphosate, as detailed below.

12.     At all times relevant to this litigation, Plaintiff used and/or was exposed to the use of Defendant's Roundup products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics. Plaintiff could not have reasonably discovered the defects and risks associated with Roundup or glyphosate-containing products prior to or at the time of Plaintiff's exposure. Plaintiff relied upon the skill, superior knowledge and judgment of Defendant.

13.     As a direct and proximate result of Defendant placing its defective Roundup products into the stream of commerce, Plaintiff has suffered and continues to suffer severe injuries, and has endured physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment. Plaintiff will continue to incur these expenses in the future.

14.     Further, as a result of purchasing a product in reliance on advertising that was false, Mr. Carias has suffered injury in fact and has lost money as a result of the unfair business practice alleged here.

15.     Plaintiff, JANET RAMIREZ, is a resident of Bronx County, New York, and brings this lawsuit on behalf of herself, as an individual, and on behalf of all other similarly situated

persons in New York.

16.     Ms. Ramirez has purchased the Product on several occasions over the past four years in reliance on Defendant's representations that the Product targets an enzyme supposedly found only in plants.

17.     Specifically, on the label of the Product Plaintiff has repeatedly purchased, the following words prominently appear: "Glyphosate targets an enzyme found in plants but not in people or pets".

18.     This representation was material to Ms. Ramirez's decision to make the purchases. Ms. Ramirez would not have purchased the Product or would have purchased alternative products in the absence of the representation.

19.     Ms. Ramirez has been diagnosed with irritable bowel syndrome/leaky gut disease. Exposure to glyphosate has been associated with her disease, and it is more probable than not that her exposure to glyphosate caused her injuries. Ms. Ramirez first learned that exposure to Roundup can cause serious illnesses sometime after March 2015 when the IARC first published its evaluation of glyphosate, as detailed below.

20.     At all times relevant to this litigation, Plaintiff used and/or was exposed to the use of Defendant's Roundup products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics. Plaintiff could not have reasonably discovered the defects and risks associated with Roundup or glyphosate-containing products prior to or at the time of Plaintiff's exposure. Plaintiff relied upon the skill, superior knowledge, and judgment of Defendant.

21.     As a direct and proximate result of Defendant placing its defective Roundup products into the stream of commerce, Plaintiff has suffered and continues to suffer severe injuries, and has endured physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment. Plaintiff will continue to incur these expenses in the future.

22.     Further, as a result of purchasing a product in reliance on advertising that was false, Ms. Ramirez has suffered injury in fact and has lost money as a result of the unfair business practice alleged here.

23.     Plaintiff, MICHAEL PICONE, is a resident of Bronx County, New York, and brings this lawsuit on behalf of himself, as an individual, and on behalf of all other similarly situated persons in New York.

24.     Mr. Picone has purchased the Product on several occasions over the past four years in reliance on Defendant's representations that the Product targets an enzyme supposedly found only in plants.

25.     Specifically, on the label of the Product Plaintiff has repeatedly purchased, the following words prominently appear: "Glyphosate targets an enzyme found in plants but not in people or pets".

26.     This representation was material to Mr. Picone's decision to make the purchases. Mr. Picone would not have purchased the Product or would have purchased alternative products in the absence of the representation.

27.     Ms. Picone has been diagnosed with renal pelvis cancer. Exposure to glyphosate has been associated with his disease, and it is more probable than not that his exposure to glyphosate caused his injuries. Mr. Picone first learned that exposure to Roundup can cause serious illnesses sometime after March 2015 when the IARC first published its evaluation of glyphosate, as detailed below.

28.     At all times relevant to this litigation, Plaintiff used and/or was exposed to the use of Defendant's Roundup products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics. Plaintiff could not have reasonably discovered the defects and risks associated with Roundup or glyphosate-containing products prior to or at the time of Plaintiff's exposure. Plaintiff relied upon the skill, superior knowledge, and judgment of Defendant.

29.     As a direct and proximate result of Defendant placing its defective Roundup products into the stream of commerce, Plaintiff has suffered and continues to suffer severe injuries, and has endured physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment. Plaintiff will continue to incur these expenses in the future.

30.     Further, as a result of purchasing a product in reliance on advertising that was false, Mr. Picone has suffered injury in fact and has lost money as a result of the unfair business practice alleged here.

31.     Plaintiff, EVELYN FLECHA, is a resident of Bronx County, New York, and brings this lawsuit on behalf of herself, as an individual, and on behalf of all other similarly situated persons in New York.

32.     Ms. Flecha has purchased the Product on several occasions over the past four years in reliance on Defendant's representations that the Product targets an enzyme supposedly found only in plants.

33.     Specifically, on the label of the Product Plaintiff has repeatedly purchased, the following words prominently appear: "Glyphosate targets an enzyme found in plants but not in people or pets".

34.     This representation was material to Ms. Flecha's decision to make the purchases. Ms. Flecha would not have purchased the Product or would have purchased alternative products in the absence of the representation.

35.     Ms. Flecha has been diagnosed with diabetes. Exposure to glyphosate has been associated with her disease, and it is more probable than not that her exposure to glyphosate caused her injuries. Ms. Flecha first learned that exposure to Roundup can cause serious illnesses sometime after March 2015 when the IARC first published its evaluation of glyphosate, as detailed below.

36.     At all times relevant to this litigation, Plaintiff used and/or was exposed to the use of Defendant's Roundup products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics. Plaintiff could not have reasonably discovered the defects and risks associated with Roundup or glyphosate-containing products prior to or at the time of Plaintiff's exposure. Plaintiff relied upon the skill, superior knowledge, and judgment of Defendant.

37.     As a direct and proximate result of Defendant placing its defective Roundup products into the stream of commerce, Plaintiff has suffered and continues to suffer severe injuries, and has endured physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment. Plaintiff will continue to incur these expenses in the future.

38.     Further, as a result of purchasing a product in reliance on advertising that was false, Ms. Flecha has suffered injury in fact and has lost money as a result of the unfair business practice alleged here.

39.     Plaintiff, ZENA MATOS, is a resident of Bronx County, New York, and brings this lawsuit on behalf of her minor child, KAILEI MATOS, and on behalf of all other similarly situated persons in New York.

40.     Ms. Matos has purchased the Product on several occasions over the past four years in reliance on Defendant's representations that the Product targets an enzyme supposedly found only in plants.

41.     Specifically, on the label of the Product Plaintiff has repeatedly purchased, the following words prominently appear: "Glyphosate targets an enzyme found in plants but not in people or pets".

42.     This representation was material to Ms. Matos' decision to make the purchases. Ms. Matos would not have purchased the Product or would have purchased alternative products in the absence of the representation.

43.    Ms. Matos has been diagnosed with kidney disease. Exposure to glyphosate has been associated with her disease, and it is more probable than not that her exposure to glyphosate caused her injuries. Ms. Matos first learned that exposure to Roundup can cause serious illnesses sometime after March 2015 when the IARC first published its evaluation of glyphosate.

44.    At all times relevant to this litigation, Plaintiff used and/or was exposed to the use of Defendant's Roundup products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics. Plaintiff could not have reasonably discovered the defects and risks associated with Roundup or glyphosate-containing products prior to or at the time of Plaintiff's exposure and relied upon the skill, superior knowledge, and judgment of Defendant.

45.    As a direct and proximate result of Defendant placing its defective Roundup products into the stream of commerce, Plaintiff has suffered and continues to suffer severe injuries, and has endured physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment. Plaintiff will continue to incur these expenses in the future.

46.    Further, as a result of purchasing a product in reliance on advertising that was false, Ms. Matos has suffered injury in fact and has lost money as a result of the unfair business practice alleged here.

47.    Plaintiff, JAIME NINO, is a resident of Queens County, New York, and brings this lawsuit on behalf of himself, as an individual, and on behalf of all other similarly situated persons in New York.

48. Mr. Nino has purchased the Product on several occasions over the past four years in reliance on Defendant's representations that the Product targets an enzyme supposedly found only in plants.

49. Specifically, on the label of the Product Plaintiff has repeatedly purchased, the following words prominently appear: "Glyphosate targets an enzyme found in plants but not in people or pets".

50. This representation was material to Mr. Nino's decision to make the purchases. Mr. Nino would not have purchased the Product or would have purchased alternative products in the absence of the representation.

51. Mr. Nino has been diagnosed with pancreatic cancer. Exposure to glyphosate has been associated with his disease, and it is more probable than not that his exposure to glyphosate caused his injuries. Mr. Nino first learned that exposure to Roundup can cause serious illnesses sometime after March 2015 when the IARC first published its evaluation of glyphosate.

52. At all times relevant to this litigation, Plaintiff used and/or was exposed to the use of Defendant's Roundup products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics. Plaintiff could not have reasonably discovered the defects and risks associated with Roundup or glyphosate-containing products prior to or at the time of Plaintiff's exposure and relied upon the skill, superior knowledge, and judgment of Defendant.

53. As a direct and proximate result of Defendant placing its defective Roundup products into the stream of commerce, Plaintiff has suffered and continues to suffer severe injuries, and has endured physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment that will continue in the future.

54.     Further, as a result of purchasing a product in reliance on advertising that was false, Mr. Nino has suffered injury in fact and has lost money as a result of the unfair business practice alleged here.

55.     Plaintiff, HALONA JAFFE, is a resident of Nassau County, New York, and brings this lawsuit on behalf of herself, as an individual, and on behalf of all other similarly situated persons in New York.

56.     Ms. Jaffe has purchased the Product on several occasions over the past four years in reliance on Defendant's representations that the Product targets an enzyme supposedly found only in plants.

57.     Specifically, on the label of the Product Plaintiff has repeatedly purchased, the following words prominently appear: "Glyphosate targets an enzyme found in plants but not in people or pets".

58.     This representation was material to Ms. Jaffe's decision to make the purchases. Ms. Jaffe would not have purchased the Product or would have purchased alternative products in the absence of the representation.

59.     Ms. Jaffe has been diagnosed with non-Hodgkins lymphoma. Exposure to glyphosate has been associated with her disease, and it is more probable than not that her exposure to glyphosate caused her injuries. Ms. Jaffe first learned that exposure to Roundup can cause serious illnesses sometime after March 2015 when the IARC first published its evaluation of glyphosate.

60. At all times relevant to this litigation, Plaintiff used and/or was exposed to the use of Defendant's Roundup products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics. Plaintiff could not have reasonably discovered the defects and risks associated with Roundup or glyphosate-containing products prior to or at the time of Plaintiff's exposure and relied upon the skill, superior knowledge, and judgment of Defendant.

61. As a direct and proximate result of Defendant placing its defective Roundup products into the stream of commerce, Plaintiff has suffered and continues to suffer severe injuries, and has endured physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment that will continue in the future.

62. Further, as a result of purchasing a product in reliance on advertising that was false, Ms. Jaffe has suffered injury in fact and has lost money as a result of the unfair business practice alleged here.

63. Moreover, on information and belief, exposure to Roundup has directly and proximately caused numerous other current and past residents of New York State to be personally injured, including, but not limited to, birth defects, Alzheimer's, endocrine disruption, autism, heart disease, cancer, inflammatory bowel disease, Parkinson's disease, Multiple Sclerosis, ALS, kidney diseases, diabetes, hypothyroidism and liver disease.

64. Defendant, MONSANTO COMPANY, ("MONSANTO"), is a Delaware corporation in "active" status with its principal place of business in St. Louis, Missouri. Defendant advertises and sells goods to consumers in New York and throughout the United States.

65.     DOES 1 – 10 are herein sued under fictitious names; when their true names are known, Plaintiffs will amend. Along with the named Defendant, each DOE Defendant is a proximate cause of Plaintiffs' harm.

## SUBSTANTIVE ALLEGATIONS

66.     Defendant manufactures Roundup, the world's most popular weed killer. Roundup's active ingredient is a potent "biocide" called glyphosate, which inhibits weeds from producing a certain enzyme they need in order to live.

67.     Glyphosate inhibits production of the enzyme, *EPSP synthase*, which is produced by weeds, plants, bacteria, fungi, algae, and billions of various microbes.

68.     Glyphosate works by inhibiting weeds from producing *EPSP synthase*—and once rendered unable to produce this enzyme—weeds cannot uptake minerals, nor can they make proteins from amino acids. Weeds then starve to death.

69.     This lawsuit challenges a specific claim that appears on all Roundup labels (*see,* **"Exhibit A"**, annexed hereto), which reads… "GLYPHOSATE TARGETS AN ENZYME FOUND IN PLANTS BUT NOT IN PEOPLE OR PETS" …as this claim is absolutely, positively false.

70.     Glyphosate does indeed target an enzyme "found in people." Produced within our bodies, the targeted enzyme is in fact "found in people"—in our gut bacteria.

71.     Defendant's claim is plainly false because the targeted enzyme, factually speaking, is "found in people," specifically, in our stomachs and intestines. Because the enzyme that glyphosate targets is indeed found in people, in our gut bacteria, it is therefore objectively false (and inherently misleading) for Defendant to claim that glyphosate targets an enzyme not found in people.

72.     The truth is, glyphosate targets an enzyme that is indisputably found in people—and based on this material fact, which Defendant cannot deny, Plaintiffs' lawsuit here prevails at this juncture.

73.     Defendant cannot deny that Roundup targets an enzyme that is physically located inside of people and this fact is beyond dispute.

74.     The precise falsehood comes with Defendant's choice of words, "found in," because the targeted enzyme is indeed "found in" people, specifically, in our gut bacteria, a.k.a. "microbiota."

75.     Commonly called gut bacteria, or gut flora, the proper term "microbiota" refers to the innumerable microbial colonies—over one hundred trillion—that dwell inside our stomachs and intestines. The total microbiota "found in" humans can weigh up to 5 lbs.—with fully one-third of our microbiota common to all humans— and many consider it an organ (just like the heart or lungs). Our microbiota are responsible for digestion, metabolism, and healthy immune system function.

76.     Glyphosate is a "non-selective" weed killer, meaning it kills indiscriminately based only on whether a given organism produces the enzyme, *EPSP synthase*. Most significantly, because our gut bacteria produce *EPSP synthase*, this means that our gut bacteria are vulnerable to being killed off by glyphosate.

77.     Just like it inhibits backyard weeds from producing *EPSP synthase*— glyphosate also inhibits our gut bacteria from producing it, and in both cases, the end result is the same; inability to produce the enzyme spells death for both backyard weeds and gut bacteria.

78.     The same chemistry that kills backyard weeds likewise kills gut bacteria, and this bacteria kill-off compromises our digestion, metabolism and vital immune system functions.

79.     Sprayed as a liquid, (not a "dust"), plants absorb glyphosate directly through their leaves, stems, and roots and detectable quantities accumulate in plant tissues. Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce or by milling, baking or brewing grains.

80.     When we eat crops sprayed with glyphosate, we ingest glyphosate, and detectable quantities accumulate in our tissues. The industry pretends that only a tad of glyphosate lingers on the outside of the food, as "topical residue," while ignoring "systemic residue" *inside* the food.

81.     Glyphosate "bio-accumulates"—our bodies store it up—and there is no safe threshold for its accumulation. Glyphosate has been detected in urine, blood, even breast milk—and 75% of rainwater samples.

82.     In addition to its use as weed killer, glyphosate also has an "off-label" use—to prematurely "ripen" crops.

83.     Ever anxious to get crops to market, farmers now accelerate the "ripening" process by using a smidgeon of glyphosate, just before harvest time, to partially starve the crops, which mimics the "ripening" process.

84. In 2013, EPA raised minimum glyphosate levels for crops and this opened the floodgates for glyphosate.

85. Despite industry rhetoric about less pesticide use, our world today is saturated with more glyphosate than ever before. Today, glyphosate is ubiquitous. Each year, approximately 250 millions pounds are sprayed on crops, suburban lawns, parks and golf courses. Driven mainly by proliferation of genetically engineered crops, glyphosate use now skyrockets. For context, as of 2001, glyphosate had become the most-used active ingredient in American agriculture with 85–90 millions of pounds used annually. That number grew to 185 million pounds by 2007. As of 2013, glyphosate was the world's most widely used herbicide.

86. Monsanto's glyphosate products are registered in 130 countries and approved for use on over 100 different crops. They are pervasive in the environment. Numerous studies confirm that glyphosate is found in rivers, streams and groundwater in agricultural areas where Roundup is used. It has been found in food, in the urine of agricultural workers, and even in the urine of urban dwellers who are not in direct contact with glyphosate.

87. Defendant genetically engineers these crops to make them glyphosate tolerant, *i.e.*, "Roundup Ready." And while these genetically engineered crops may be glyphosate tolerant, our gut bacteria most certainly are not.

88. Glyphosate is a "biocide," essentially an "antibiotic," which means that most Americans eat "antibiotics" at every meal. Some believe that glyphosate causes "antibiotic-resistant" bacterial infections, and many folks take dietary supplements, *"probiotics,"* to replenish the beneficial gut bacteria that glyphosate kills.

89.     As farmers spray ever more glyphosate, season after season, some weeds become resistant and fields are then overgrown with "super weeds." This same phenomenon also occurs in our stomachs and intestines; as we ingest ever more glyphosate, meal after meal, some gut bacteria become resistant and our bodies are then overgrown with these heartier microbes—essentially "super weeds." And when this happens, the resulting imbalance allows opportunistic pathogens to rise-up and spread disease throughout our bodies.

90.     Because glyphosate kills off gut bacteria that regulate digestive functions, many believe it is responsible for America's chronic indigestion.

91.     Further, because it kills-off gut bacteria that regulate *immune system functions*, many believe glyphosate is responsible for America's chronic auto-immunity disorders.

92.     Additionally, because it kills-off our gut bacteria, glyphosate is linked to stomach and bowel problems, indigestion, ulcers, colitis, gluten intolerance, insomnia, lethargy, depression, Crohn's Disease, Celiac Disease, allergies, obesity, diabetes, infertility, liver disease, renal failure, autism, Alzheimer's and endocrine disruption.

93.     Moreover, the W.H.O. recently announced that glyphosate is "probably carcinogenic" (many believe that the EPA has known, for at least 30 years, of glyphosate's cancer-causing potential; *see, e.g.,* **"Exhibit B"**, annexed hereto).

94.     In particular, On March 20, 2015, the IARC, an agency of the W.H.O., issued an evaluation of several herbicides, including glyphosate. This evaluation was based, in part, on studies of exposures to glyphosate in several countries around the world, and it traces the health implications from exposure to glyphosate since 2001.

95.     On July 29, 2015, the IARC issued the formal monograph relating to glyphosate. In that monograph, the IARC Working Group provides a thorough review of the numerous studies and data relating to glyphosate exposure in humans.

96.     The IARC Working Group classified glyphosate as a Group 2A herbicide, which means that it is probably carcinogenic to humans.

97.     The IARC evaluation is significant. It confirms what has been believed for years: that glyphosate is toxic to humans.

98.     Nevertheless, Monsanto, since it began selling Roundup, has represented it as safe to humans and the environment. Indeed, Monsanto has repeatedly proclaimed and continues to proclaim to the world, and particularly to United States consumers, that glyphosate-based herbicides, including Roundup, create no unreasonable risks to human health or to the environment.

99.     For nearly 40 years, farms, lawns, parks and golf courses across the world have used Roundup without knowing of the dangers its use poses. That is because when Monsanto first introduced Roundup, it touted glyphosate as a technological breakthrough: it could kill almost every weed without causing harm either to people or to the environment. Of course, history has shown that not to be true. In fact, as per the IARC, above, the main chemical ingredient of Roundup, glyphosate, is a probable cause of cancer.

100.    Monsanto assured the public that Roundup was harmless. In order to prove this, Monsanto championed falsified data and attacked legitimate studies that revealed its dangers. Monsanto has led a prolonged campaign of misinformation to convince government agencies, farmers and the general population that Roundup was safe.

101.    Based on early studies that glyphosate could cause cancer in laboratory animals,

the EPA originally classified glyphosate as *possibly carcinogenic to humans* (Group C) in 1985.

After pressure from Monsanto, including contrary studies it provided to the EPA, the EPA changed

its classification to *evidence of non-carcinogenicity in humans* (Group E) in 1991.  In so classifying

glyphosate, however, the EPA made clear that the designation did not mean the chemical does not

cause cancer, stating: "[i]t should be emphasized, however, that designation of an agent in Group E

is based on the available evidence at the time of evaluation and should not be interpreted as a

definitive conclusion that the agent will not be a carcinogen under any circumstances."

102.    On two occasions, the EPA found that the laboratories hired by Monsanto to test

the toxicity of its Roundup products for registration purposes committed fraud.

103.    In the first instance, Monsanto, in seeking initial registration of Roundup by EPA,

hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies

relating to Roundup. IBT performed about 30 tests on glyphosate and glyphosate-containing

products, including nine of the 15 residue studies needed to register Roundup.

104.    In 1976, the United States Food and Drug Administration ("FDA") performed an

inspection of IBT that revealed discrepancies between the raw data and the final report relating to

the toxicological impacts of glyphosate. The EPA subsequently audited IBT; it too found the

toxicology studies conducted for the Roundup herbicide to be invalid. An EPA reviewer stated,

after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific

integrity of the studies when they said they took specimens of the uterus from male rabbits."

105.    Three top executives of IBT were convicted of fraud in 1983.

106.    In the second incident of data falsification, Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including for Roundup. In that same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.

107.    Moreover, in 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup, were **"safer than table salt"** and **"practically non-toxic"** to mammals, birds, and fish.

108.    Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup were the following:

> a) Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences ...

> b) And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

> c) Roundup biodegrades into naturally occurring elements.

> d) Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

> e) This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it.

f) You can apply Accord with " confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.

g) Glyphosate is less toxic to rats than table salt following acute oral ingestion.

h) Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

i) You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

j) "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.

109.    On November 19, 1996, Monsanto entered into an Assurance of Discontinuance

with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing

or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a) its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk.

b) its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable.

c) its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

d) its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics."

e) glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides;

f) its glyphosate-containing products or any component thereof might be classified as "practically" non-toxic.

110.     Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so today.

111.     Further, in 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup. The French court affirmed an earlier judgment that Monsanto had falsely advertised its herbicide Roundup as "biodegradable" and that it "left the soil clean."

112.     On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph 112. For Volume 112, a Working Group of 17 experts from 11 countries met at IARC from March 3–10, 2015 to assess the carcinogenicity of certain herbicides, including glyphosate.

113.     The March meeting culminated nearly a one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available".

114.     Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

115.     Exposure pathways were identified as air (especially during spraying), water and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

116.     The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden. These studies show a human health concern from agricultural and other related exposure to glyphosate.

117.     The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin lymphoma ("NHL") and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

118.     Importantly, the IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

119.     In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor, renal tubule carcinoma. A second study reported a positive trend for haemangiosarcoma in male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

120.     The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

121.     The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

122.     The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate. Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

123.     The IARC Working Group also reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina. While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and Multiple Myeloma, Hairy Cell Leukemia (HCL), and Chronic Lymphocytic Leukemia (CLL), in addition to several other cancers.

124.     It should also be noted that the EPA has a technical fact sheet, as part of its Drinking Water and Health, National Primary Drinking Water Regulations publication, relating to glyphosate. This technical fact sheet predates the IARC March 20, 2015, evaluation. The fact sheet describes the release patterns for glyphosate as follows:

### Release Patterns

Glyphosate is released to the environment in its use as a herbicide for controlling woody and herbaceous weeds on forestry, right-of- way, cropped and non-cropped sites. These sites may be around water and in wetlands.

It may also be released to the environment during its manufacture, formulation, transport, storage, disposal and cleanup, and from spills. Since glyphosate is not a listed chemical in the Toxics Release Inventory, data on releases during its manufacture and handling are not available.

Occupational workers and home gardeners may be exposed to glyphosate by inhalation and dermal contact during spraying, mixing, and cleanup. They may also be exposed by touching soil and plants to which glyphosate was applied. Occupational exposure may also occur during glyphosate's manufacture, transport storage, and disposal.

125.    In 1995, the Northwest Coalition for Alternatives to Pesticides reported that in California, the state with the most comprehensive program for reporting of pesticide-caused illness, glyphosate was the third most commonly reported cause of pesticide illness among agricultural workers.

126.    Several countries around the world have instituted bans on the sale of Roundup and other glyphosate-containing herbicides, both before and since the IARC first announced its assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit as the dangers of the use of Roundup become more widely known.

127.    For instance, the Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup, which takes effect by the end of 2015. In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated: "[a]gricultural pesticides in user-friendly packaging are sold in abundance to private persons. In garden centers, Roundup is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are. Children, in particular, are sensitive to toxic substances and should therefore not be exposed to it."

128. France banned the private sale of Roundup and glyphosate following the IARC assessment for Glyphosate.

129. Bermuda banned both the private and commercial sale of glyphosates, including Roundup. The Bermuda government explained its ban as follows: "[f]ollowing a recent scientific study carried out by a leading cancer agency, the importation of weed spray 'Roundup' has been suspended."

130. The Sri Lankan government banned the private and commercial use of glyphosates, particularly out of concern that glyphosate has been linked to fatal kidney disease in agricultural workers.

131. The government of Colombia announced its ban on using Roundup and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the W.H.O.'s finding that glyphosate is probably carcinogenic.

132. Plaintiffs will now reveal the multi-layered deception that underpins the claim, "[g]lyphosate targets an enzyme found in plants, but not in people or pets" (*see,* **"Exhibit A"**).

133. Remarkably, this 13-word sentence contains a grand total of three material falsehoods:

        (i) "found in" – Defendant's claim that glyphosate targets an enzyme not "found in" people is of course plainly false; as above stated, *EPSP synthase* is indeed "found in" people;

(ii)  "an enzyme" – Defendant's claim that glyphosate targets "an"
enzyme is false; the truth is, glyphosate also inhibits production of *other*
plant and animal "enzymes"—plural, not singular; and

(iii)  "targets" – Defendant's claim that glyphosate "targets" is false;
glyphosate is a "non-selective" weed killer that kills indiscriminately; in
other words, it "targets" nothing. Glyphosate is a patented "biocide"—
*i.e.*, it "kills life."

134.  Defendant misleads the general public by concealing the truth about (a) glyphosate,
and (b) the enzyme, *EPSP synthase*, namely: (i) that *EPSP synthase* is "found in" people and pets;
(ii) that glyphosate inhibits production of many *other* plant and animal enzymes; and (iii) that
glyphosate lacks the ability to target with specificity.

135.  Glyphosate is an indiscriminate killer that broadly kills—and the individual
glyphosate molecules have no way of knowing whether they're killing weeds in our backyards or
"weeds" in our digestive systems.

136.  In addition to being objectively false, Defendant's advertising claim is also
inherently misleading because it creates the impression that glyphosate has no affect on people or
pets, when in reality, it directly affects both people and pets—by killing-off beneficial gut bacteria.

137.  The fact that all Roundup labels bear the same false and misleading slogan (*see,*
**"Exhibit A"**), demonstrates Defendant's intent to misinform the public.

138.  Plaintiffs detrimentally relied on Defendant's false claims.

139.    When they purchased Roundup, Plaintiffs believed that glyphosate targets and kills only the weeds in our backyards, but Plaintiffs now know the real truth, *i.e.*, that glyphosate also targets and kills the "weeds" in our digestive systems, which contain beneficial gut bacteria that our bodies require for proper digestion, metabolism, and healthy immune system function.

140.    Plaintiffs are entitled to judgment because Defendant cannot deny that our digestive systems contain bacteria that produce *EPSP synthase,* which glyphosate inhibits. Plaintiffs must therefore prevail.

141.    As a direct result of Defendant's false claims, Plaintiffs were led to believe that Roundup would not affect them, but their beliefs were based on Defendant's falsehoods.

142.    Defendant continues to sell Roundup with false and misleading labeling; therefore, Plaintiffs seek a court order to prohibit Defendant from ever again falsely claiming that glyphosate targets an enzyme, "*not found in people or pets.*"

143.    Unless restrained by court order, Defendant will continue to mislead others.

## CLASS ACTION ALLEGATIONS

144.    Plaintiffs seek relief in their individual capacity and seek to represent a class consisting of all others who are similarly situated.

145.    Pursuant to Fed. R. Civ. P. 23(a) and (b)(2) and/or (b)(3), Plaintiffs seek certification of a class initially defined as follows:

> **All persons who from June 23, 2011 until the date notice is disseminated to the Class (the "Class Period"), purchased Roundup, or Roundup-related products in New York and who suffered a personal injury as a direct result of exposure to Roundup, or Round-up related products.**

146. Excluded from the Class are Defendant and its subsidiaries and affiliates, Defendant's executives, board members, legal counsel, the judges and all other court personnel to whom this case is assigned, their immediate families, and those who purchased the Product for the purpose of resale.

147. Numerosity. Fed. R. Civ. P. 23(a)(1). The potential members of the Class as defined are so numerous that joinder of all members is unfeasible and not practicable. While the precise number of Class members has not been determined at this time, Plaintiffs are informed and believe that many thousands or millions of consumers have purchased the Product.

148. Commonality. Fed. R. Civ. P. 23(a)(2) and (b)(3). There are no affirmative defenses that Defendant may assert against some, but not all members. There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class members. These common questions of law and fact include, without limitation:

> (a) Whether Defendant's claim that "[g]lyphosate targets an enzyme found in plants but not in people or pets" is true or false or likely to deceive a reasonable consumer;
>
> (b) Whether Defendant violated New York General Business Law § 349;
>
> (c) Whether Defendant violated New York General Business Law § 350; and
>
> (d) The nature of the relief, including equitable relief, to which Plaintiffs and the Class members are entitled.

149. Typicality. Fed. R. Civ. P. 23(a)(3). Plaintiffs' claims are typical of the claims of the Class. Plaintiffs and all Class members were exposed to uniform practices and sustained injury arising out of and caused by Defendant's unlawful conduct.

150. Adequacy of Representation. Fed. R. Civ. P. 23(a)(4). Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class. Plaintiffs' Counsel are competent and experienced and anticipate no difficulties in maintaining this litigation as a class action.

151. Superiority of Class Action. Fed. R. Civ. P. 23(b)(3). A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all the members of the Class is impracticable.

Furthermore, the adjudication of this controversy through a class action will avoid the possibility of inconsistent and potentially conflicting adjudication of the asserted claims.

152. Injunctive and Declaratory Relief. Fed. R. Civ. P. 23(b)(2). Defendant's misrepresentations are uniform as to all members of the Class. Defendant has acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or declaratory relief is appropriate with respect to the Class as a whole.

## FIRST CAUSE OF ACTION
### (Violation of New York General Business Law § 349)

153. Plaintiffs incorporate by reference and re-allege the substantive allegations set forth above.

154. As alleged above, by advertising, marketing, distributing and/or selling the Product to Plaintiffs and Class members, Defendant engaged in and continues to engage in deceptive acts and practices in violation of Section 349 of the New York General Business Law.

155. Plaintiffs, on behalf of themselves and Class members, seek compensatory damages and, in addition, equitable relief in the form of an Order requiring Defendant to refund Plaintiffs and all Class members all monies they paid for the Product.

156. Plaintiffs and Class members seek to enjoin such unlawful deceptive acts and practices alleged above.

157. Each Class member will be irreparably harmed unless Defendant's unlawful actions are enjoined because Defendant will continue to mislead consumers with its deceptive advertising. Therefore, Plaintiffs and Class members request an Order prohibiting Defendant from engaging in the alleged misconduct and performing a corrective advertising campaign.

## SECOND CAUSE OF ACTION
### (Violation of New York General Business Law § 350)

158. Plaintiffs incorporate by reference and re-allege the substantive allegations set forth above.

159. Plaintiffs bring this claim on behalf of themselves and on behalf of the Class.

160. As described above, Defendant engaged in false and misleading marketing and advertising claims by falsely representing that the Product "targets an enzyme found in plants but not in people or pets" in violation of Section 350 of the New York General Business Law.

161. As set forth above, Defendant engaged in and continues to engage in false advertising by promoting, marketing, distributing and/or selling the Product to Plaintiffs and Class members.

162.     As a direct and proximate result of Defendant's violations, Plaintiffs suffered injury in fact and, in addition, lost money.

163.     Plaintiffs, on behalf of themselves and Class members, seek compensatory damages and, in addition, equitable relief in the form of an Order requiring Defendant to refund Plaintiffs and Class members all monies they paid for the Product.

164.     Plaintiffs and Class members seek to enjoin such unlawful deceptive acts and practices alleged above. Each Class member will be irreparably harmed unless Defendant's unlawful actions are enjoined because Defendant will continue to mislead consumers with its deceptive advertising. Therefore, Plaintiffs and Class members request an Order prohibiting Defendant from engaging in the alleged misconduct and performing a corrective advertising campaign.

## THIRD CAUSE OF ACTION
### (Strict Liability/Failure to Warn)

165.     Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

166.     Plaintiffs bring this strict liability claim against Defendant for failure to warn.

167.     At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup products, which are defective and unreasonably dangerous to consumers, including Plaintiffs, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup and specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Defendant.

168.    Defendant researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce its Roundup products, and in the course of same, directly advertised or marketed the products to consumers and end users, including the Plaintiffs, and therefore had a duty to warn of the risks associated with the use of Roundup and glyphosate-containing products.

169.    At all times relevant to this litigation, Defendant had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps as necessary to ensure that its Roundup products did not cause users and consumers to suffer from unreasonable and dangerous risks. Defendant had a continuing duty to warn the Plaintiffs of the dangers associated with Roundup use and exposure. Defendant, as manufacturer, seller, or distributor of chemical herbicides is held to the knowledge of an expert in the field.

170.    At the time of manufacture, Defendant could have provided the warnings or instructions regarding the full and complete risks of Roundup and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

171.    At all times relevant to this litigation, Defendant failed to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of its products and to those who would foreseeably use or be harmed by Defendant's herbicides, including Plaintiffs.

172.    Despite the fact that Defendant knew or should have known that Roundup posed a grave risk of harm, it failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure.

The dangerous propensities of its products and the carcinogenic characteristics of glyphosate, as described above, were known to Defendant, or scientifically knowable to Defendant through appropriate research and testing by known methods, at the time it distributed, supplied, or sold the product, and not known to end users and consumers, such as Plaintiffs.

173. Defendant knew or should have known that its products created significant risks of serious bodily harm to consumers, as alleged herein, and Defendant failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to its products. Defendant has wrongfully concealed information concerning the dangerous nature of Roundup and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup and glyphosate.

174. At all times relevant to this litigation, Defendant's Roundup products reached the intended consumers, handlers, and users or other persons coming into contact with these products in New York and throughout the United States, including Plaintiffs, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendant.

175. Plaintiffs were exposed to Defendant's Roundup products, as described above, without knowledge of their dangerous characteristics.

176. At all times relevant to this litigation, Plaintiffs used and/or were exposed to the use of Defendant's Roundup products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

177.    Plaintiffs could not have reasonably discovered the defects and risks associated with Roundup or glyphosate-containing products prior to or at the time of Plaintiffs' exposure. Plaintiffs relied upon the skill, superior knowledge, and judgment of Defendant.

178.    Defendant knew or should have known that the minimal warnings disseminated with its Roundup products were inadequate, but they failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended and reasonably foreseeable uses.

179.    The information that Defendant did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled Plaintiffs to utilize the products safely and with adequate protection.

Instead, Defendant disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries with use of and/or exposure to Roundup and glyphosate; continued to aggressively promote the efficacy of its products, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup and glyphosate.

180.    To this day, Defendant has failed to adequately and accurately warn of the true risks of Plaintiffs' injuries associated with the use of and exposure to Roundup and its active ingredient glyphosate, which is genotoxic and a probable carcinogen.

181. As a result of their inadequate warnings, Defendant's Roundup products were defective and unreasonably dangerous when they left the possession and/or control of Defendant and were distributed by Defendant.

182. Defendant is liable to Plaintiffs for injuries caused by its negligent or willful failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of its products and the risks associated with the use of or exposure to Roundup and glyphosate.

183. The defects in Defendant's Roundup products were substantial and contributing factors in causing Plaintiffs' injuries, and, but for Defendant's misconduct and omissions, Plaintiffs would not have sustained their injuries.

184. Had Defendant provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with its Roundup products, Plaintiffs could have avoided the risk of developing injuries as alleged herein and/or could have obtained alternative herbicides.

185. As a direct and proximate result of Defendant placing its defective Roundup products into the stream of commerce, Plaintiffs have suffered and continue to suffer severe injuries, and have endured physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment. Plaintiffs will continue to incur these expenses in the future.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

## FOURTH CAUSE OF ACTION
### (Negligence)

186.     Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

187.     Defendant, directly or indirectly, caused Roundup products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by Plaintiffs.

188.     At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of its Roundup products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers and users of the product.

189.     At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the marketing, advertisement, and sale of the Roundup products. Defendant's duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup, and, in particular, its active ingredient glyphosate.

190.     At all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup and specifically, the genotoxic and carcinogenic properties of the chemical glyphosate.

191.     Accordingly, at all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known that use of or exposure to its Roundup products could cause or be associated with Plaintiffs' injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including Plaintiffs.

192.     Defendant also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup were unaware of the risks and the magnitude of the risks associated with use of and/or exposure to Roundup and glyphosate-containing products.

193.     As such, Defendant breached its duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of its Roundup products, in that Defendant manufactured and produced defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in its products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

194.     Despite its ability and means to investigate, study, and test its products and to provide adequate warnings, Defendant has failed to do so. Indeed, Defendant has wrongfully concealed information and has further made false and/or misleading statements concerning the safety and/or exposure to Roundup and glyphosate.

195.    Defendant's negligence included:

(i) Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing its Roundup products without thorough and adequate pre- and post-market testing;

(ii) Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup;

(iii) Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup products and glyphosate-containing products were safe for their intended use;

(iv) Failing to use reasonable and prudent care in the design, research, manufacture, and development of Roundup products so as to avoid the risk of serious harm associated with the prevalent use of Roundup/glyphosate as an herbicide;

(v) Failing to design and manufacture Roundup products so as to ensure they were at least as safe and effective as other herbicides on the market;

(vi) Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Defendant could reasonably foresee would use and be exposed to its Roundup products;

(vii) Failing to disclose to Plaintiffs, users/consumers, and the general public that use of and exposure to Roundup presented severe risks of cancer and other grave illnesses;

(viii) Failing to warn Plaintiffs, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to Plaintiffs and other consumers;

(ix) Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup and glyphosate-containing products;

(x) Representing that its Roundup products were safe for their intended use when, in fact, Defendant knew or should have known that the products were not safe for their intended purpose;

(xi) Declining to make or propose any changes to Roundup products' labeling or other promotional materials that would alert the consumers and the general public of the risks of Roundup and glyphosate;

(xii) Advertising, marketing, and recommending the use of the Roundup products, while concealing and failing to disclose or warn of the dangers known by Defendant to be associated with or caused by the use of or exposure to Roundup and glyphosate;

(xiii) Continuing to disseminate information to its consumers, which indicates or implies that Defendant's Roundup products are not unsafe for use; and

(xiv) Continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

196.    Defendant knew and/or should have known that it was foreseeable that consumers such as Plaintiffs would suffer injuries as a result of Defendant's failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of Roundup.

197.    Plaintiffs did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup or its active ingredient glyphosate.

198.    Defendant's negligence was the proximate cause of the injuries, harm, and economic losses that Plaintiffs suffered, and will continue to suffer, as described herein.

199.    Defendant's conduct, as described above, was reckless. Defendant regularly risks the lives of consumers and users of their products, including Plaintiffs, with full knowledge of the dangers of its products.

Defendant has made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Plaintiffs. Defendant's reckless conduct therefore warrants an award of punitive damages.

200.  As a proximate result of Defendant's wrongful acts and omissions in placing its defective Roundup products into the stream of commerce without adequate warnings of the hazardous and carcinogenic nature of glyphosate, Plaintiffs have suffered and continue to suffer severe and permanent physical and emotional injuries. Plaintiffs have endured pain and suffering, have suffered economic losses (including significant expenses for medical care and treatment) and will continue to incur these expenses in the future.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

## JURY DEMAND

Plaintiffs demand a trial by jury of all claims in this Complaint so triable.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the other members of the Class proposed in this Complaint, respectfully request that the Court enter judgment in their favor and against Defendant as follows:

A.     Declaring that this action is a proper class action, certifying the Class as requested herein, designating Plaintiff, MIQUEL CARIAS, as Class Representative and appointing the undersigned counsel as Class Counsel;

B.     Ordering Defendant to pay actual damages, compensatory damages and equitable monetary relief to Plaintiffs and the other members of the Class;

C.     Ordering Defendant to pay punitive damages, as allowable by law, to Plaintiffs and the other members of the Class;

D.     Ordering Defendant to pay statutory damages, as allowable by the statutes asserted herein, to Plaintiffs and the other members of the Class;

E.     Awarding injunctive relief as permitted by law or equity, including enjoining Defendant from continuing the unlawful practices as set forth herein, and ordering Defendant to engage in a corrective advertising campaign;

F.     Ordering Defendant to pay attorneys' fees and litigation costs to Plaintiffs and the other members of the Class;

G.     Ordering Defendant to pay both pre- and post-judgment interest on any amounts awarded; and

H.      Ordering such other and further relief as may be just and proper.

Dated: New York, New York
       November 13, 2015

                                        Respectfully submitted,

                                        GABRIELLI LEVITT LLP

                                        By: _____
                                            Michael J. Gabrielli (MG-2421)
                                        2426 Eastchester Road, Suite 103
                                        Bronx, New York 10469
                                        Tel.: (718) 708-5322

                                        *Counsel for Plaintiffs and the Proposed Class*